**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

GENERAL ELECTRIC CO.,                                        23-CV-10736 (VSB) (VF)

                              Plaintiff,              **OPINION &ORDER**

            -against-

L3HARRIS TECHNOLOGIES, INC.,

                              Defendant.
-----------------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge.**

        On August 13, 2024, Plaintiff General Electric Company ("GE") and Defendant L3Harris

Technologies, Inc. ("L3Harris") submitted a joint letter to the Court, raising a discovery dispute

concerning L3Harris's withholding of 24 documents on the basis of attorney-client privilege,

work-product doctrine, and common-interest privilege. See ECF No. 56. The documents, many

of which are e-mail communications, include a non-party, Hilco Streambank ("Hilco"). The crux

of the dispute between the parties is whether the withheld communications with Hilco are

protected from disclosure by the attorney-client privilege or the work-product doctrine. For the

reasons explained below, they are not.

# BACKGROUND

A. Factual Background[1]

This case concerns a dispute over the ownership of two "blocks" of static Internet Protocol ("IP") addresses.[2] The American Registry for Internet Numbers ("Arin") oversees the administration of certain static IP addresses, like the ones at issue in this case. ECF No. 70 at 1; ECF No. 1 at ¶¶ 3-5, 55. Arin maintains a database containing information about IP blocks, including, among other things, who registered the IP address. ECF No. 70 at 1.

The IP blocks at issue were first registered in 1989 and 1991, by Harris Controls and Composition, a division of L3Harris's predecessor, Harris. Id. at 2. The IP addresses were registered by Harris with the predecessor to Arin, as Arin did not come into existence until 1997. Id. at 2 n.1. In 1995, Harris and GE formed a joint venture. Id. at 2; see also ECF No. 1 at ¶ 34. Around 2001, Harris sold its interest in the joint venture to GE. ECF No. 70 at 2; see also ECF No. 1 at ¶ 48. GE contends that the IP blocks at issue were transferred to the joint venture and thus GE believes that it owns the IP blocks through its buyout of Harris in 2001. ECF No. 1 at ¶¶ 6-9. Conversely, L3Harris asserts that it owns the IP blocks because ownership of the blocks was never transferred to the joint venture between GE and Harris and thus ownership remained

---

[1] Unless otherwise noted, citations to the Court's electronic docket ("ECF") are to documents in this case, No. 23-CV-10736. Page citations to documents on ECF are to the ECF-generated page numbers.

[2] An IP address is a unique number that identifies a specific device connected to the internet. ECF No. 1 at ¶ 3. IP addresses can be static or dynamic. Id. ¶ 4. At issue in this case are two blocks of static IP addresses. Id. ¶ 2. Static IP addresses can be sold in blocks in private transactions, and IP addresses are valuable because there exist a finite number. ECF No. 70 at 1.

with Harris, and later L3Harris. ECF No. 70 at 2; ECF No. 49 at Counterclaim ¶¶ 10-11. GE

seeks a declaratory judgment that it has the right to control the IP blocks. ECF No. 1 at ¶¶ 78-84.

      Typically, a company will engage an IP broker to assist it in selling IP blocks. See ECF

No. 70 at 2. Hilco is L3Harris's IP broker, and L3Harris has used Hilco in the past to sell IP

blocks. See, e.g., L3Harris v. Gen. Elec. Co., No. 24-CV-2671 (VSB), ECF No. 1 at ¶¶ 48, 76.[3]

In December 2021, L3Harris, in the midst of trying to sell the two IP blocks, learned that another

company, GE, claimed to own the same IP blocks. ECF No. 70 at 2; ECF No. 70-1 at Bates

ARIN_GE_00024-25. L3Harris admits that "absent this dispute," it "would have used Hilco as a

broker" in its sale of the IP blocks, as it had done previously with other IP blocks. ECF No. 70 at

2-3.

      In April 2022, Mitch Evander, Chief IP Counsel for L3Harris, and Christine Ricci,

General Counsel for GE, began communicating concerning ownership of the IP Blocks. See ECF

No. 70-2 at 2. Around July 2022, Evander sought assistance from Hilco regarding ownership of

the IP blocks. ECF No. 70 at 2. The subject of the parties' instant dispute concerns 17 documents

that are e-mail communications between, on the one hand, Evander and other employees of

L3Harris, and on the other, two employees of Hilco, Charles Abramson and Jack Hazan.[4] The

disputed e-mail communications begin on July 6, 2022 and continue through July 6, 2023.

---

[3] On November 16, 2023, L3Harris filed suit against GE in the Middle District of Florida, seeking a declaratory judgment that it owned the disputed IP blocks. See No. 24-CV-2671, ECF No. 1 at ¶ 1. That case was transferred to this Court on April 9, 2024, and consolidated with the instant case. See id. ECF Nos. 47, 52.

[4] The 24 withheld documents were submitted to the Court for *in camera* review. See ECF No. 70 at 4 (listing the documents submitted). In a cover letter accompanying the documents, L3Harris indicated that Hazan is an attorney, and Abramson is not. Although the scope of the dispute initially concerned 24 documents, L3Harris agreed to produce to GE six of the previously disputed documents. See id. at 5. Of the 18 remaining documents, one document

B.  Procedural Background

On August 13, 2024, the parties submitted a joint letter to the Honorable Vernon S. Broderick. See ECF No. 56. L3Harris had withheld all of its e-mail communications with non-party Hilco on the basis of the attorney-client privilege, common-interest privilege, and the work-product doctrine. Id. at 4-6. GE objected to the assertion of privilege over those communications. Id. at 1-3. The Court held a conference to address the dispute on September 24, 2024. At the conference, the Court asked L3Harris to submit the withheld documents for *in camera* review. The Court held a second conference to address the dispute on October 9, 2024. At that conference, the Court addressed application of the common-interest privilege to the withheld documents and explained why the privilege did not apply to the disputed documents. Following the conference on October 9, 2024, the parties submitted additional briefing to address application of the attorney-client privilege, work-product doctrine, and United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961), to the withheld documents. See ECF Nos. 70, 72.

**DISCUSSION**

A.  Legal Standards

1.  *Attorney-Client Privilege*

The attorney-client privilege protects "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011).

---

contains highlighting by counsel. See id. (discussing Privilege Log Entry No. 42). That document was appropriately withheld given the annotations it contains by counsel. The documents addressed in this opinion are the 17 remaining e-mail communications, identified herein by their "privilege log entry #." See id. at 4 (listing Privilege Log Entry Nos. 2, 12, 14-16, 19-21, 27, 29, 30-31, 33-35, 46, 57).

The party invoking the privilege bears the burden of demonstrating that the privilege applies. In re Grand Jury Proc., 219 F.3d 175, 182 (2d Cir. 2000).

The privilege "generally applies only to communications between the attorney and the client." United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999). Although not dispositive, "the presence of a third party counsels against finding that the communication was intended to be, and actually was, kept confidential." Mejia, 655 F.3d at 134. Courts, however, have extended the attorney-client privilege to communications involving "persons assisting the lawyer in the rendition of legal services," including "office personnel, such as secretaries and law clerks, who assist lawyers in performing their tasks." In re Grand Jury Subpoenas Dated Mar. 24, 2003, 265 F. Supp. 2d 321, 325 (S.D.N.Y. 2003).

In United States v. Kovel, the Second Circuit held that the attorney-client privilege applied to communications with a third-party—an accountant employed by the client's attorney—where "the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer." 296 F.2d 918, 922 (2d Cir. 1961). In Kovel, the Court recognized that the inclusion of a third party "in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client." Ackert, 169 F.3d at 139. The privilege does not extend, however, to a communication between an attorney and a third party "solely because the communication proves important to the attorney's ability to represent the client." Id. at 139 (rejecting application of attorney-client privilege to communications between investment banker and attorney even where "those conversations significantly assisted the attorney in giving his client legal advice about its tax situation"). Nor does Kovel apply where the communication between the attorney and third party "merely

5

provides additional 'information the client did not have' for the lawyer to 'advise his client . . . about the legal and financial implications' of an action." Sampedro v. Silver Point Capital, L.P., 818 F. App'x 14, 19 (2d Cir. 2020) (quoting Ackert, 169 F.3d at 138-40) (cleaned up). Instead, the communication between the attorney and third party must be "to translate or interpret information given to [the attorney] by his client." Ackert 169 F.3d at 139-40 (rejecting application of Kovel where attorney communicated with third party to obtain information client "did not have about the proposed transaction and its tax consequences"). So long as the third party serves "a specialized purpose akin to an accountant who deciphers financial information so that the lawyer can effectively counsel the client," the communications between the attorney and third party are protected by the attorney-client privilege. Sampedro, 818 F. App'x at 19.

   *2.  Work-Product Doctrine*

   "Federal law governs the applicability of the work product doctrine in all actions in federal court." Wultz v. Bank of China Ltd., 304 F.R.D. 384, 393 (S.D.N.Y. 2015). "[D]ocuments and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" are eligible for work product protection. Fed. R. Civ. P. 26(b)(3)(A). For the work-product doctrine to apply, the party claiming protection bears the burden of establishing "that the material at issue '(1) [is] a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by [its] representative.'" Pilkington N. Am., Inc. v. Mitsui Sumimoto Ins. Co. of Am., 341 F.R.D. 10, 13 (S.D.N.Y. 2022) (quoting Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008)).

   Concerning the second prong, "[i]n anticipation of litigation" means that "in light of the nature of the document and the factual situation in the particular case, the document can fairly be

6

said to have been prepared or obtained because of the prospect of litigation." United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998). "Documents prepared in anticipation of litigation are work product, even when they are also intended to assist in business dealings." Schaeffler v. United States, 806 F.3d 34, 43 (2d Cir. 2015). But "[d]ocuments prepared in the ordinary course of business, or that would have been created whether or not litigation was anticipated, are not protected by work-product immunity." In re Copper Antitrust Litig., 200 F.R.D. 213, 221 (S.D.N.Y. 2001). A party's "consider[ation of] the possibility of litigation . . . is insufficient to trigger the protection of the work product doctrine[.]" Gucci Am., Inc. v. Guess?, Inc., 271 F.R.D. 58, 75 (S.D.N.Y. 2010). "Rather, the party must have taken 'affirmative steps in anticipation of litigation.'" Brook v. Simon & Ptrs., LLP, No. 17 Civ. 6435 (GBD) (SLC), 2021 WL 5919207, at *4 (S.D.N.Y. Dec. 15, 2021) (quoting Gucci, 271 F.R.D. at 75).

In contrast to the attorney-client privilege, "the protection afforded work product is not waived merely because the material is disclosed to a third party." Bank of Am., N.A. v. Terra Nova Ins. Co., 212 F.R.D. 166, 169 (S.D.N.Y. 2002). A party does, however, "waive[ ] the work product protection by taking actions inconsistent with . . . its purpose, such as disclosing work product to its adversary,[ ] or by placing privileged documents 'at issue' in a litigation[.]" N.Y. Times Co. v. U.S. Dep't of Justice, 939 F.3d 479, 494 (2d Cir. 2019) (internal citations omitted).

"The party asserting the protection of the work-product doctrine bears the burden of proof." Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP, No. 03 Civ. 5560 (RMB) (HBP), 2007 WL 473726, at *4 (S.D.N.Y. Feb. 14, 2007). A party can meet this burden "only by an evidentiary showing based on competent evidence . . . and [it] cannot be 'discharged by mere conclusory or ipse dixit assertions.'" Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D.

465, 470 (S.D.N.Y. 1993) (quoting <u>von Bulow by Auersperg v. von Bulow</u>, 811 F.2d 136, 146 (2d

Cir. 1987)) (internal citations omitted).

   B.  <u>Application</u>

     *1.  The contested communications are not protected by the attorney-client privilege.*

L3Harris contends that <u>Kovel</u> applies to protect its communications with Hilco, because

Hazan and Abramson at Hilco were assisting Evander at L3Harris "in understanding the

relevance of the facts already in L3Harris's possession," so that Evander could provide legal

advice to L3Harris concerning ownership of the IP blocks. <u>See</u> ECF No. 70 at 6; <u>see also</u> ECF

No. 56 at 5-6. L3Harris adds that "Hilco was an expert in the niche field of IP block transfers and

was providing its expertise to L3Harris in this area." ECF No. 70 at 6.

GE argues that <u>Kovel</u> cannot apply to these communications because L3Harris was not

using Hilco to interpret or translate information originating from L3Harris, but instead was using

Hilco to gather publicly available information from Arin's registry. <u>See</u> ECF No. 72 at 2-3.

Additionally, GE argues that to the extent Hilco used its industry expertise to advice L3Harris

about how to interpret the parties' prior joint venture agreements or how to proceed with the sale

of the IP blocks, such advice did not originate from a lawyer and is thus not privileged. <u>Id.</u> at 4.

GE further contends that no privileged relationship exists between L3Harris and Hilco because

there is no evidence of a retainer or engagement agreement to show that Hilco was acting under

the supervision of L3Harris' counsel in an investigative or consultative capacity. <u>Id.</u>

To begin, the disputed communications are not protected by the attorney-client privilege.

First, there is no evidence that the at-issue communications were between a client and his

attorney for the purpose of obtaining legal advice. By L3Harris' own admission, Hilco was

retained by L3Harris as a broker to sell or otherwise dispose of the IP blocks. <u>See L3Harris v.</u>

Gen. Elec. Co., No. 24-CV-2671 (VSB), ECF No. 1 at ¶ 76. In its complaint in the related action

against GE, L3Harris described its relationship with Hilco as a "business relationship" grounded

in the joint economic benefit of selling the IP blocks. Id. ¶¶ 76, 83-84; see also id. ECF No. 36 at

3, 11. And L3Harris' argument for application of the privilege in the instant dispute is premised

on Hilco providing specialized knowledge and expertise in this niche area involving the sale of

IP blocks. See ECF No. 70 at 2 (describing IP brokers such as Hilco as being "uniquely

knowledgeable and qualified to assist with the process of finding buyers and the process of

transferring ownership of IP blocks"); see also id. at 6 (explaining that Hilco provided expertise

in field of IP block transfers). L3Harris has not pointed to any evidence that Hilco was retained

as a legal advisor to provide legal advice.

Abramson and Hazan reviewed agreements and other related documents from Harris's

sale of its interest to GE, and provided their thoughts concerning those documents to L3Harris.

See, e.g., Privilege Log Entry Nos. 2, 21, 30-31, 33, 34-35. Evander had questions about the joint

venture documents and both Abramson and Hazan provided their insights. Abramson, however,

is not an attorney. Hazan is an attorney, but L3Harris has not come forth with any evidence, such

as a retainer agreement or other document, that would support a finding that Hazan was retained

by L3Harris to provide legal advice, rather than, as L3Harris has said, for his expertise in

brokering a sale of the IP blocks. Nor has L3Harris identified a document or agreement that

would suggest that Hilco was providing investigative or consultative services under the

supervision of L3Harris's counsel. See Montesa v. Schwartz, No. 12-CV-6057 (CS) (JCM), 2016

WL 3476431, at *6 (S.D.N.Y. June 2016) ("Plaintiffs' counsel does not even assert that they had

any sort of formal agreement with these third parties in which they would directly supervise their

investigative or consultative functions.").

Second, <u>Kovel</u> does not apply to extend the attorney-client privilege to the at-issue documents. An *in camera* review of the contested communications reveals that Evander used Hazan and Abramson at Hilco to obtain information about the IP blocks that L3Harris did not have in its possession. For example, in response to various requests from Evander, Abramson or Hazan reviewed publicly available information in the Arin registry and provided the information to Evander, along with their respective insights and thoughts based on their understanding of IP blocks and the Arin registry. <u>See, e.g.</u>, Privilege Log Entry Nos. 12, 14, 15, 16, 19, 20, 27, 46. Others at L3Harris also turned to Hilco to obtain information about the IP blocks from the Arin registry. <u>See</u> Privilege Log Entry No. 29.

There is no evidence in the contested communications that Hilco was interpreting, deciphering, or translating information from L3Harris so that Evander could provide effective legal advice to L3Harris. <u>See Ackert</u>, 169 F.3d at 139-40 (explaining that <u>Kovel</u> applies to communications between attorney and third party that are "to translate or interpret information given to [the attorney] by his client"). Instead, it is apparent from the questions asked by Evander that Evander was seeking out information from Hilco that L3Harris did not have but wanted to have for its discussions with GE. <u>See, e.g.</u>, Privilege Log Entry Nos. 12, 14; <u>see also Ackert</u>, 169 F.3d at 139-40 (rejecting application of <u>Kovel</u> where attorney communicated with third party to obtain information client "did not have about the proposed transaction and its tax consequences"). Although that information may have proved indispensable to Evander's provision of legal advice to L3Harris, the privilege does not extend to a communication between an attorney and a third party "solely because the communication proves important to the attorney's ability to represent the client." <u>Id.</u> at 139. Because Abramson and Hazan were providing new information to Evander and others at L3Harris and because there is no basis to

conclude that Abramson and Hazan were interpreting or translating information for Evander that L3Harris already possessed, <u>Kovel</u> does not apply to the communications at issue. Accordingly, the contested communications are not protected by the attorney-client privilege.

   *2.   The contested communications are not protected by the work-product doctrine.*

L3Harris also claims that the work-product doctrine applies to the contested communications. To qualify for work-product protection, "[t]he document at issue must have been 'prepared with an eye to some specific litigation.'" <u>Montesa</u>, 2016 WL 3476431, at *8 (quoting <u>Occidental Chem. Corp. v. OHM Remediation Servs. Corp.</u>, 175 F.R.D. 431, 434 (W.D.N.Y. 1997)) (emphasis omitted). "The work product doctrine 'requires a more immediate showing than the remote possibility of litigation[,]' meaning that 'litigation must at least be a real possibility at the time of preparation[.]'" <u>Montesa</u>, 2016 WL 3476431, at *8 (quoting <u>Occidental Chem. Corp.</u>, 175 F.R.D. at 434) (alterations in original). A party's "consider[ation of] the possibility of litigation . . . is insufficient to trigger the protection of the work product doctrine." <u>Gucci Am., Inc.</u>, 271 F.R.D. at 75; <u>see also</u> <u>In re Grand Jury Proc.</u>, No. M-11-189, 2001 WL 1167497, at *15 (S.D.N.Y. Oct. 3, 2001) (explaining that "a generalized desire to avoid litigation is insufficient to meet the 'in anticipation of litigation' requirement"). For application of the work-product doctrine, "the party must have taken 'affirmative steps in anticipation of litigation.'" <u>Simon & Ptrs., LLP</u>, 2021 WL 5919207, at *4 (quoting <u>Gucci</u>, 271 F.R.D. at 75).

L3Harris began the process of selling the IP blocks in August 2021. ECF No. 70 at 2. On December 6, 2021, Arin told L3Harris that it had "received communication from the Point of Contact [for the IP blocks] stating there is a dispute regarding the Internet number resources requesting to be transferred." ECF No. 70-1 at Bates ARIN_GE_00024-00025. Simply stated, L3Harris learned that there was an issue concerning who owned the IP blocks. The first of the

11

disputed communications is an email from July 6, 2022, between Evander and Hazan and Abramson. See Privilege Log Entry No. 21. By that time, L3Harris had already had communications with GE's counsel concerning the IP blocks. See ECF No. 70-2 at 2. Between July 6, 2022, and August 18, 2022, there is no indication in the email communications that L3Harris was taking affirmative steps in anticipation of litigation. See Privilege Log Entry Nos. 12, 14-16, 19-21, 46, 57. L3Harris and GE were discussing ownership of the IP blocks, but the communications do not support a finding that the communications were sent "because of the prospect of litigation." Cf. Gucci Am., Inc., 271 F.R.D. at 75 (concluding that merely sending cease-and-desist letters, even if party considered possibility of litigation had letter recipient "responded negatively to the warning letter," was not sufficient to trigger work-product doctrine). There is no discussion of an anticipated lawsuit. There is no discussion concerning litigation strategy. And, there is no discussion concerning potential claims. Nothing about the substance of the communications demonstrates that L3Harris believed there was a real possibility of litigation. See Montessa, 2016 WL 3476431, at *8-9 (applying work-product doctrine to documents that discussed "potential litigation"). Even if the communications showed that L3Harris considered the *possibility* of litigation (and they do not), that still would be insufficient to trigger application of the work product doctrine. Brook, 2021 WL 5919207, at *5. As such, L3Harris has not met its burden to show that the work-product doctrine applies to the at-issue communications between July 6, 2022, and August 18, 2022. See Privilege Log Entry Nos. 12, 14-16, 19-21, 46, 57.

On December 16, 2022, Arin informed L3Harris that "[t]he legal team at ARIN will be reviewing your documentation but would like to let you know that should both sides appear to have some reasonable legal claim then Arin will not be able to make a decision." ECF No. 70-1

at Bates ARIN_GE_00010. Arin explained that "[i]t is usually best if the parties involved in a dispute either work together for a solution or gain a court order with direction to Arin." Id. Arin reiterated those instructions on February 16, 2023. Id. at Bates ARIN_GE_00009-10.

After the communications in July and August 2022, the disputed communications pick up again with an e-mail on April 26, 2023. See Privilege Log Entry No. 2. Even though the e-mails from April 26, 2023, through July 6, 2023, were sent after Arin had notified L3Harris that the ownership of the IP blocks was in dispute, there is no indication in the communications that L3Harris was even contemplating litigation, let alone taking affirmative steps in advance of litigation. See United States v. Adlman, 68 F.3d 1495, 1501 (S.D.N.Y. 1995) (explaining that if "the expected litigation is merely a vague abstract possibility without precise form" it weighs against application of the protection); Gould Inc. v. Mitsui Min. & Smelting Co. Ltd., 825 F.2d 676, 680 (2d Cir. 1987) (explaining that work-product protection "depends upon the existence of a real, rather than speculative, concern that the thought processes of [ ] counsel in relation to pending or anticipated litigation would be exposed").

L3Harris points to Arin's notification that "a court may need to resolve the dispute" to argue that the communications were sent with an awareness of the prospect of litigation and were therefore sent in anticipation of litigation. See ECF No. 70 at 3, 6. But Arin didn't require a court order to resolve the dispute. Arin expressly left open the possibility that the parties could "work together for a solution." ECF No. 70-1 at Bates ARIN_GE_00010. And nothing in the at-issue communications suggests that L3Harris had ruled out the possibility of an out-of-court resolution with GE. Accordingly, the communications between April 26, 2023, and July 6, 2023, are also not protected by the work-product doctrine. See Privilege Log Entry Nos. 2, 27, 29, 30-31, 33-35.

## <u>CONCLUSION</u>

For the reasons discussed herein, the withheld communications are not protected from disclosure by the attorney-client privilege or work-product doctrine. L3Harris is directed to turn over the following 17 documents to GE: Privilege Log Entry Nos. 2, 12, 14-16, 19-21, 27, 29, 30-31, 33-35, 46, 57.

**SO ORDERED.**

DATED:          New York, New York
                November 19, 2024

_____
VALERIE FIGUEREDO
United States Magistrate Judge